# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-101


**AMERIFACTORS FINANCIAL GROUP, LLC**

**VERSUS**

**DUNHAM PRICE GROUP, LLC**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2019-4937
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**CANDYCE G. PERRET**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Candyce G. Perret, Jonathan W. Perry, and Wilbur L. Stiles, Judges.


**AFFIRMED.**

**Michael H. Bagot, Jr.**
**Christian J. St. Martin**
**Wagnor, Bagot & Rayer, LLP**
**601 Poydras Street, Suite 1660**
**New Orleans, LA  70130**
**(504) 525-2141**
**COUNSEL FOR PLAINTIFF/APPELLANT/CROSS-APPELLEE:**
    **AmeriFactors Financial Group, LLC**

**Jefferson R. Tillery**
**Jones Walker, LLP**
**201 St. Charles Avenue, 47th Floor**
**New Orleans, LA  70170-5100**
**(504) 582-8000**
**COUNSEL FOR DEFENDANTS/APPELLEES/CROSS-APPELLANTS:**
    **Dunham Price Group, LLC**
    **DP Aggregates, LLC**

**Jessica S. Allain**
**Jones Walker, LLP**
**600 Jefferson Street, Suite 1600**
**Lafayette, LA  70506**
**(337) 593-7625**
**COUNSEL FOR DEFENDANTS/APPELLEES/CROSS-APPELLANTS:**
    **Dunham Price Group, LLC**
    **DP Aggregates, LLC**

**PERRET, Judge.**

AmeriFactors Financial Group, LLC (hereafter "AmeriFactors"), an accounts receivable factor, filed suit against DP Aggregates, LLC and Dunham Price Group, LLC (hereafter, collectively "Dunham Price") for unpaid invoices in the amount of $635,976.70. Dunham Price filed a reconventional demand alleging claims of bad faith breach of contract, detrimental reliance, and unjust enrichment. After a four-day trial, the jury rejected the claims of both parties and awarded no damages. AmeriFactors filed a Motion for Judgment Notwithstanding the Verdict ("JNOV"), which the trial court denied.

AmeriFactors now appeals the denial of its JNOV judgment as well as the judgment, in accordance with the jury verdict, that dismissed its claims against Dunham Price, with prejudice. Dunham Price answered the appeal. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

On April 22, 2019, Dunham Price, a family-owned construction company, entered into a contract with Kiewit Louisiana Company ("Kiewit"), general contractor for the Venture Global Calcasieu Pass, LLC LNG export project ("Venture Global"), to supply sand from Westlake, Louisiana, to the project under development in Cameron Parish. Ryan Price, Executive Vice-President of Dunham Price, testified at trial that the Kiewit contract was signed by Rick Sprigg, Dunham Price's Vice President of Aggregate Operations, and that Dunham Price provided a bond "in the amount of approximately $11.2 million" to guarantee its performance under the contract. Ryan Price further testified that if Dunham Price "failed to deliver an average of 25,000 tons [of sand] on a sixweek growing average" then

Dunham Price would be responsible for liquidated damages in the amount of $2 per ton not delivered.

In March 2019, Dunham Price entered into the "Barge Transportation Agreement" with Genesis Venture Logistics, LLC ("Genesis"), to handle the marine logistics for moving the sand from its facility in Lake Charles, Louisiana, to the Venture Global project site in Cameron Parish. The contract was for the term of May 1, 2019 to September 1, 2019, and was signed by Rick Sprigg and Lorraine Hyde, the Chief Executive Officer ("CEO") of Genesis. The contract required payment "[n]et 45 days from invoice; 2.0% interest per month after 60 days." Genesis did not obtain a bond to secure its performance on the project. To assist in the performance of the job, Genesis hired the following subcontractors: Dale Martin Offshore, LLC; Patriot Construction and Industrial, LLC; and Devall Towing & Boat, LLC.

Thereafter, Genesis sought financing from AmeriFactors, a subsidiary of Gulf Coast Bank & Trust Company, so that it could pay for the services it contractually promised to Dunham Price. Specifically, on April 26, 2019, Lorraine Hyde, on behalf of Genesis, and Cynthia Klein, on behalf of AmeriFactors, entered into a Factoring Agreement wherein AmeriFactors would purchase certain accounts receivables owed to Genesis and, in exchange for payment, Genesis assigned the purchased accounts to AmeriFactors. According to Kathryn Diego, an account executive with AmeriFactors, once Dunham Price verified an invoice, "AmeriFactors would immediately provide 80% of the invoice total to Genesis," and that "upon payment by [Dunham Price] of the invoice according to the payment term, some other percentage of the invoice (up to 20% minus fees) would be paid by AmeriFactors to Genesis."

2

On May 7, 2019, Alexandria Brown, on behalf of AmeriFactors, sent an email to Christy Duplechain, a staff accountant at Dunham Price, stating that it had "recently entered into an agreement with Genesis . . . as their accounts receivable management team[,]" and requested that Dunham Price verify Genesis' invoice. Attached to the email was a verification form, which stated as follows:

> **GENESIS VENTURE LOGISTICS, L.L.C.** wishes to assign Invoice #10342 ($561,000.00). Please review the attached invoice(s) and sign below to verify that all the product and/or equipment as shown on the invoice(s) has been received and is correct, all work has been completed as shown on the invoice(s), that the amount stated on the invoices(s) will be paid by your office, that there are no disputes, claims of offset, credits owed, prior payments, discounts, or any other matters that you contend reduces your obligation to pay the full amount of the invoice(s), and that you waive your right to assert any defense to payment of the invoice(s). In the event of a dispute related to this transaction, the prevailing party shall be entitled to recover its reasonable fees and costs.
>
> We/I further confirm that the total amount shown on the invoice(s) will be paid to AmeriFactors at . . . and shall constitute an agreement not to assert defenses or claims against payment pursuant to the Uniform Commercial Code.

Also attached to the email was a May 8, 2019 invoice from Genesis to Dunham Price for $561,000 for barge sand deliveries to the Venture Global site. Robert Price, III, as CEO of Dunham Price, signed the verification form on May 8, 2019.

Between months June–September 2019, AmeriFactors forwarded to Dunham Price an additional twelve identical verification agreements with various Genesis' invoices attached, which Rick Sprigg signed on behalf of Dunham Price.

On May 13, 2019, AmeriFactors delivered a general notice of assignment to Dunham Price, which stated as follows, in pertinent part:

> In order to accommodate the changes and growth to our business, Genesis . . . has been fortunate to obtain the services of AmeriFactors, which will now serve as our accounts receivable management team. Please accept this letter as notification that all of Genesis . . . accounts and invoices have been irrevocably assigned to AmeriFactors. This

3

assignment will remain in force unless and until you receive express written notification from AmeriFactors. Payment of the above referenced invoices and all future invoices due Genesis . . . must be made payable to AmeriFactors[.]

Dunham Price paid the first six verified invoices without issue; however, it refused to pay the last seven invoices, totaling $635,976.70, which are the subject of this appeal. Specifically, the following invoice numbers and amounts at issue are as follows: (1) invoice number 10371, in the amount of $98,097.86;[1] (2) invoice number 10374, in the amount of $97,799.63;[2] (3) invoice number 10375, in the amount of $65,047.00;[3] (4) invoice number 10380, in the amount of $97,775.74;[4] (5) invoice number 10385, in the amount of $130,638.16;[5] (6) invoice number 10389, in the amount of $53,640.02;[6] and (7) invoice number 10398, in the amount of $92,978.29.[7]

Although AmeriFactors received Dunham Price's verification agreements for the seven invoices at issue, Dunham Price made the decision in late August 2019 to

---

[1] Genesis' July 29, 2019 invoice description was for "Barge Freight for Dunham Price" and "Sand Deliveries to Venture Global LNG Site 7/25-7/28."

[2] Genesis' August 1, 2019 invoice description was for "Barge Freight for Dunham Price" and "Sand Deliveries to Venture Global LNG Site Balance of Tonages [sic] Through 7/31" and "Total Tonages [sic] for July: 89,325.25."

[3] Genesis' August 5, 2019 invoice description was for "Barge Freight for Dunham Price" and "Sand Deliveries to Venture Global LNG Site (8/1-8/4)."

[4] Genesis' August 12, 2019 invoice description was for "Barge Freight for Dunham Price" and "Sand Deliveries to Venture Global LNG Site (8/5-8/11)."

[5] Genesis' August 19, 2019 invoice description was for "Barge Freight for Dunham Price" and "Sand Deliveries to Venture Global LNG Site (8/12-8/18)."

[6] Genesis' August 26, 2019 invoice description was for "Barge Freight for Dunham Price" and "Sand Deliveries to Venture Global LNG Site (8/19-8/25)."

[7] Genesis' September 4, 2019 invoice description was for "Barge Freight for Dunham Price" and "Sand Deliveries to Venture Global LNG Site (8/26-9/1)."

halt all payments to AmeriFactors. Specifically, Robert Price, III, testified in his February 13, 2020 affidavit, as follows (emphasis in original):

14. However, in late August 2019, Dunham Price began receiving communications from Genesis' subcontractors Dale Martin, Patriot, and Devall indicating that they were not receiving payment from Genesis. The amounts outstanding were substantial: Patriot was owed $725,057.41, Devall was owed $447,007.63, and Dale Martin was owed $171,832.80.

15. DP Aggregates had, by that point, signed thirteen (13) invoices, and paid to Amerifactors six (6) Genesis['] invoices totaling approximately $**1,186,164.77**.

16. Upon learning that Genesis' subcontractors were not being paid out of the funds paid to Genesis/AmeriFactors by DP Aggregates, DP Aggregates halted payment to Genesis/AmeriFactors. The purpose of this was twofold: to ensure that the innocent third party subcontractors were paid, and to ensure that DP Aggregates did not end up paying both Genesis *and* Genesis' subcontractors.

17. Payment was halted by DP Aggregates on a further seven (7) signed invoices totaling $635,976.70.

18. A final two were presented by AmeriFactors to DP Aggregates but never signed by DP Aggregates totaling $175,399.71.

19. The total nine (9) outstanding invoices owed to Genesis (seven owed to factor AmeriFactors) total $811,376.41.

20. DP Aggregates was left holding the bag for Genesis' failure to pay its subcontractors: I knew that the Private Works Act protects subcontractors like Patriot, Devall, and Dale Martin by providing lien rights on the job should any contractor or subcontractor fail to pay a debt for services rendered on the job. DP Aggregates had, as part of its contract with project general contractor Kiewit, signed a contract agreeing to take responsibility for the debts of the subcontractors below it, in order to prevent subcontractors from filing liens against the job. DP Aggregates also executed a substantial bond to ensure its ability to pay any such claims. Accordingly, DP Aggregates knew that should its subcontractor Genesis fail to pay *its* subcontractors, DP Aggregates would have to step in and make those payments.

21. DP Aggregates has now paid the subcontractors in full to the tune of $**1,326,714.56**. That sum was paid directly to the subcontractors, and is additional to the $1,186,164.77 paid to Genesis by DP Aggregates through payments to AmeriFactors.

5

22.    Although DP Aggregates owed only nine (9) invoices to Genesis (totaling $811,376,41), seven (7) of which were purchased by AmeriFactors (totaling $635,976.70) and two (2) of which were not (totaling $175,399.71), DP Aggregates paid the subcontractors $1,326,714.56 directly in satisfaction of Genesis' debts. **Accordingly, DP Aggregates has *already* overpaid on the Genesis work by $515,338.15.**

On October 21, 2019, AmeriFactors filed suit against Dunham Price for "breach[ing] the verification and payment agreements by failing and refusing to pay the balance due in the amount of $635,976.70 within forty-five (45) days, as agreed in the various verification and payment agreements."

On November 12, 2019, Dunham Price answered the petition, requested a jury trial, and asserted affirmative defenses, namely: "den[ying] that an enforceable agreement exists barring DP Aggregates from asserting defenses or claims to payment of the invoices at issue and/or amounts claimed pursuant to Louisiana Revised Statutes title 10 or pursuant to any other law[,]" and that "[t]he purported agreements between Plaintiff AmeriFactors and DP Aggregates do not form a valid or binding contract due to a failure of consideration and/or a failure of cause."

On December 26, 2019, AmeriFactors filed a motion for summary judgment citing La.R.S. 10:9-403, titled "Agreement not to assert defenses against assignee" in support of its request that it be awarded "the principal amount owed, $635,976.70, finance charges of $33,763.56 (through 12/31/19)," along with attorney fees and costs. In support of its motion, AmeriFactors attached: (1) the December 26, 2019 affidavit of Kristina Connors-Edele, the Vice President of Special Assets for AmeriFactors; (2) the April 26, 2019 Factoring Agreement between AmeriFactors and Genesis; (3) a copy of the May 13, 2019 General Notice of Assignment from AmeriFactors to Dunahm Price; and (4) copies of the verification and payment

6

agreements, signed by Rick Sprigg, for invoices 10371, 10374, 10375, 10380, 10385, 10389, and 10398.

On February 19, 2020, Dunham Price filed an opposition to the motion for summary judgment, alleging that it was "victimized by the bad acts of Genesis and/or Genesis and AmeriFactors in failing to pay the subcontractors (among other acts), those parties acting with full knowledge that the burden would fall to [Dunham Price] to pay the debts to the subcontractors should they fail to pay." Dunham Price argued that La.R.S. 10:9-403 is not applicable because "[t]he statute plainly requires that in order for an agreement not to assert defenses against an assignee to be valid, that agreement must be made **between the account debtor [here, DP Aggregates] and the assignor [here, Genesis]**."[8] Dunham Price further argued that "the purported agreement to waive claims and defenses . . . is invalid on its face for failure of cause and consideration."

On March 1, 2021, Dunham Price filed a supplemental and amended memorandum in opposition to motion for summary judgment, arguing that there are material issues of fact and law that preclude summary judgment. Dunham Price argued that "at no time was [it] informed by either Genesis or AmeriFactors that Genesis was in desperate financial shape, or that Genesis would be using a factor to fund its operations" and that it "would not have agreed to verify the invoices had it understood the true nature of the relationship between Genesis and AmeriFactors or had it been aware of Genesis' financial situation."

On March 8, 2021, AmeriFactors replied to the supplemental opposition arguing that "Dunham Price agreed that the invoices represented services performed

---

[8] Alterations and emphasis in original.

7

and waived all defenses and counterclaims to payment" and that it "relied upon Dunham Price's representations in purchasing the invoices." AmeriFactors argued that summary judgment is proper and that "Dunham [Price] is bound by its agreement to the verification and payment agreement terms regardless of whether those terms are burdensome, onerous, or gratuitous, and without regard to whether Dunham [Price] received economic value in return."

After a hearing on March 15, 2021, the trial court denied AmeriFactors' motion for summary judgement.

On March 8, 2022, AmeriFactors filed a renewed motion for summary judgment after taking the depositions of Dunham Price's representatives. AmeriFactors argued that it did not provide false or misleading information about Genesis to Dunham Price and that it did not coerce or force Dunham Price to sign the verification agreements. In support of its renewed motion, it attached the June 28, 2021 corporate deposition of Dunham Price, through Ryan Price, who stated, in pertinent part:

> Q. Did Dunham Price Group ask Genesis Venture Logistics to provide any references or recommendations from other customers to see if Genesis Venture Logistics was qualified to perform the work that you were asking them to do on the Kiewit project?
>
> A. Not that I'm aware of, no.
>
> Q. Did Dunham Price Group inquire of Genesis Venture Logistics as to how Genesis was going to be able to afford to provide the tugs and barges and other equipment necessary to perform the work that was going to be done on the Kiewit project?
>
> A. No.
>
> Q. Did Dunham Price Group ask Genesis Venture Logistics to provide a bond to secure its performance of its portion of the Kiewit contract?
>
> A. No.

8

Q.      Is there some reason why it didn't?

A.      Maybe a -- No.  We didn't -- We didn't[.]

        . . . .

Q.      And upon receiving Exhibit number 3 [the first verification agreement signed by Dunham Price] from AmeriFactors, what did Dunham Price Group do in response?

A.      Well, I do know that my -- I do know that my brother actually contacted our bank, our banker at the time, and talked to him about basically, "What the hell is a factoring company?" and that our bank -- our bank advised us to not sign this agreement.  But our backs were against the wall more or less is why we signed it, why my brother signed it.

Q.      And in what fashion were your collective backs against the wall?

A.      Well, because we had a -- You know, we'd already had a good working relationship with Kiewit.  We had already been awarded a contract from them to supply Redi-Mix concrete and to -- an alternate to supply them with piling for their project.  So we had a good working relationship with them as a customer already, and we basically were given this at the last minute when they were already hounding on us to get them sand delivered down there.

        And so my brother went against the advice of our bank and went -- and signed the agreement to basically get the boats and the barges to our dock to start delivering sand, because if we didn't, there was [sic] penalties and downtime delay payments and -- and then we would have been damaging our relationship with Kiewit as well to not deliver sand.  And we knew if we didn't sign it that we probably would take us about another month for us to just go out on our own and get barges and boats and line up the project ourselves without Lorraine and without AmeriFactors, and that we –

        . . . .

A.      And we would have paid some pretty stiff penalties, not to mention damage our customer relationship that we had a good one with with [sic] Kiewit.

        . . . .

Q.      Did AmeriFactors do anything to force you to sign it?

A.      No, they didn't hold a gun to our head, but Lorraine was basically telling us that if we didn't sign it that there would be no barges or boats.

9

Q.     So, the reason that you felt there was a gun to your head was that you thought it would be more expensive to refuse to sign it than it would be to sign it and take your chances?

MR. TILLERY:

Objection.  He just said he didn't -- there was no gun to his head.  He just said that.

You can answer it, Ryan.

THE WITNESS:

Yes, that's correct.

. . . .

Q.     Did AmeriFactors provide Dunham Price Group with any false information about Genesis Venture Logistics?

A.     No, not that I'm aware of.

Q.     Did AmeriFactors provide Dunham Price Group with any misleading information about Genesis Venture Logistics?

A.     No, not that I'm aware of.

Also attached to AmeriFactors renewed motion for summary judgment was

the July 7, 2021 deposition of Robert Price, III, who testified as follows:

Q.     You understood, though, in signing this agreement that you were obligated to pay AmeriFactors this $561,000 invoice without regard to whether Genesis Venture Logistics did what they were supposed to do or not?

A.     Right.  I did understand that.

Q.     So you knew you were taking a risk at that point that they would perform their contract?

A.     Correct.

. . . .

Q.     Did you do any investigation into whether or not Genesis Venture Logistics was financially capable of performing its contract with Dunham-Price Group?

A. No.

Q. Why didn't you do that?

A. Why should I?

Q. So you didn't think that investigating the financial wherewithal of one of your –

A. There was no time -- There was no time. There was no time to do it. If I had received this and I had a month to investigate it, I certainly would have. But we had our arms behind our backs. We had to make a decision this very day. I had no time.

. . . .

Q. Did you do anything from March to April to May to investigate Dunham -- Excuse me -- Genesis Venture Logistics' financial ability to perform its contract?

. . . .

THE WITNESS:

No. We'd had a 20-year relationship with Miss Lorraine Hyde. You know, we had no reason to believe that she was illegitimate during that time period. And then the day before we start the job essentially we get this agreement, and we were completely shocked. But we had no choice.

While AmeriFactors' renewed motion for summary judgment was pending, Dunham Price filed a petition in reconvention, with attachments, on March 30, 2022, asserting three causes of action against AmeriFactors: (1) bad faith breach of contract; (2) detrimental reliance; and (3) unjust enrichment and/or quantum meruit. Dunham Price argued that Amerifactors acted in bad faith because it made misrepresentations to it about the nature of its relationship with Genesis and that AmeriFactors knew or should have known that Genesis was in no position to fulfill its financial obligations to it under the Barge Transportation Agreement. Dunham Price also argued, again, that it did not waive any defenses to payment of the

11

assigned invoices because AmeriFactors had not fulfilled the conditions of La.R.S. 10:9-403 and had failed to act in good faith.

On April 18, 2022, AmeriFactors answered the reconventional demand and also asserted affirmative defenses. Also on that date, AmeriFactors filed a motion for summary judgment on Dunham Price's reconventional demand, alleging that "Dunham Price cannot allege both breach of contract and unjust enrichment" and argued "there is no genuine issue of material fact that Dunham Price understood the verification agreements and understood it was obligated to pay AmeriFactors regardless of whether Genesis performed the work." AmeriFactors also argued that: (1) Dunham Price failed to show that it had a legal obligation to disclose Genesis' protected financial information; (2) Dunham Price failed to allege any facts or offer any evidence demonstrating AmeriFactors' failure to act in good faith in performance of the contract; and (3) Dunham Price cannot produce any evidence to support a claim for detrimental reliance or unjust enrichment. In support of the motion for summary judgment on Dunham Price's reconventional demand, AmeriFactors attached: (1) the seven invoice verification agreements along with the invoices; (2) the corporate deposition of Dunham Price, Ryan Price; (3) the deposition of Robert Price, III; and (4) a copy of the December 26, 2019 memorandum in support of its motion for summary judgment.

On April 18, 2022, Dunham Price filed an opposition to AmeriFactors' renewed motion for summary judgment wherein it argued that "[t]here was no agreement between Assignor Genesis and Debtor DP Aggregates as required by La.R.S. 10:9-403(b)" and that "[t]he [v]erification [l]etter that contained a purported waiver of defenses was sent by AmeriFactors on AmeriFactors['] letterhead to DP Aggregates; Genesis was not a party to this letter agreement." In support of its

12

opposition, Dunham Price attached the December 10, 2020 deposition of AmeriFactors, through its designated representative, Kristina Connors-Edele, and the February 26, 2021 affidavit of Ryan Price, to argue that it was never informed "by either Genesis or AmeriFactors that Genesis was in desperate financial shape, or that Genesis would be using a factor to fund its operations[,]" and that it "would not have agreed to verify the invoices had it understood the true nature of the relationship between Genesis and AmeriFactors or had it been aware of Genesis' financial situation." Specifically, Ms. Connors-Edele testified, regarding the May 7, 2019 written communication between AmeriFactors and Dunham Price, as follows:

> Q. Okay. In this particular letter or e-mail [from Alexandria Brown], there's no mention that AmeriFactors is a factoring company. It says it's an "accounts receivable management team." Is there a difference?
>
> A. We typically put it that way so as to not cause any immediate concern with regards to the client having a factor involved. There's sometimes a negative annoto -- annotation with that. So we kind of use the terms together, in conjunction together, because we do manage the accounts receivable that we purchase.
>
> Q. And it does indicate there in that particular letter that AmeriFactors and Genesis are a team, does it not?
>
> A. Yes.
>
> Q. Okay. And as a team, this letter is -- this letter is representing to Dunham Price that AmeriFactors and Genesis are working together as a team, as a management team for accounts receivable, true?
>
> A. Yes. For the accounts receivables that we purchase.

The affidavit of Ryan Price also addressed the relationship between Genesis and AmeriFactors, which stated in pertinent part:

> 7. DP Aggregates and its affiliates had never before worked with a factor, and were unaware of what a factor was. AmeriFactors did not

13

disclose to DP Aggregates either that AmeriFactors was a factor for Genesis, or what a factor was.

8.  DP Aggregates relied on AmeriFactors' representation.

9.  Neither Genesis nor AmeriFactors ever disclosed to DP Aggregates that Genesis was in a dire financial condition, that Genesis could not fund the project without AmeriFactors, or that Genesis had a significant history of nonpayment of debts owed to former factors, co-contractees, and subcontractors.

10.  DP Aggregates would not have agreed to verify the invoices had it understood the true nature of the relationship between Genesis and AmeriFactors or had it been aware of Genesis' financial situation.

11.  Genesis threatened not to begin work on the Barge Transportation Agreement between DP Aggregates and Genesis if DP Aggregates did not sign the invoices presented to it by AmeriFactors. Given that we had contractual obligations to Kiewit and faces penalties for nonperformance or late performance, DP Aggregates signed the invoices in some instances before work even began. This includes notably the first invoice presented by AmeriFactors to DP Aggregates on May 7, 2019.

12.  AmeriFactors, not Genesis, contacted DP Aggregates seeking verification (or signature) of the Genesis invoices.

On May 6, 2022, Dunham Price filed an opposition to AmeriFactors' motion for summary judgment on its reconventional demand, alleging that summary judgment is inappropriate because there are questions of fact for the jury to decide, "such as whether a contract existed between AmeriFactors and Dunham Price[,]" "whether AmeriFactors acted in bad faith[,]" and "whether Rick Sprigg had any authority to act on behalf of Dunham-Price, let alone contractual capacity to bind the company."

After a hearing held on May 12, 2022, the trial court denied the motions for summary judgment and set the matter for a jury trial.

14

Following a trial on June 20–23, 2022, "the jury returned a verdict finding that neither party was entitled to recover on its claims against one another." The jury's verdict was as follows:

**(1) Did AmeriFactors prove that Dunham-Price/DP Aggregates breached its contracts with AmeriFactors?**

**Yes** _____     **No  X**\_\_\_\_

If the answer to question 1 is Yes, then proceed to question 2.
If the answer to question 1 is No, proceed to question 5.

**(2) Did AmeriFactors prove that Dunham-Price/DP Aggregates validly waived its defenses to AmeriFactors' claims?**

**Yes** _____     **No**_____

If the answer to question 2 is Yes, proceed to question 4.
If the answer to question 2 is No, proceed to question 3.

**(3) Did Dunham-Price/DP Aggregates prove its defenses to AmeriFactors' breach of contract claim?**

**Yes** _____     **No**_____

Proceed to question 4.

**(4) What is the total amount of damages, if any, that you award to AmeriFactors?**

$_____

**(5) Did Dunham-Price and/or DP Aggregates prove that AmeriFactors breached its contract?**

**Yes** _____     **No  X**\_\_\_\_

Proceed to Question 6.

**(6) Did Dunham-Price and/or DP Aggregates prove that they relied on AmeriFactors' representations to their detriment?**

**Yes** _____     **No  X**\_\_\_\_

Proceed to question 7.

**(7) If you answered No to both question 5 and question 6, do you find that Dunham-Price and/or DP Aggregates has proven that AmeriFactors was unjustly enriched?**

**Yes** _____ **No  X**\_\_\_\_

Proceed to question 8.

**(8) If any of the answers to questions #5, 6, or 7 were yes, what amount of damages do you award to Dunham-Price and/or DP Aggregates?  If all answers were no, proceed to question 9.**

$_____

**(9) Which of the parties to this suit is the prevailing party entitled to recover its attorneys' fees and costs?  Check only one.**

**AmeriFactors** \_\_\_\_     **OR     Dunham-Price/DP Aggregates** \_\_\_\_

On July 13, 2022, the trial court rendered the following judgment, in pertinent part, in accordance with the jury verdict:

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Defendants Dunham-Price Group, L.L.C. and DP Aggregates, L.L.C. and against Plaintiff AmeriFactors Financial Group, LLC on all of Plaintiff's claims in its Petition and dismissing these claims with prejudice.

> IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Plaintiff AmeriFactors Financial Group, LLC and against Defendants Dunham-Price Group, L.L.C. and DP Aggregates, L.L.C. on all of Defendants' claims in their Petitions in Reconvention and dismissing these claims with prejudice.

On August 1, 2022, AmeriFactors filed a motion for JNOV arguing that the "evidence presented and established at trial are so strongly and overwhelmingly in favor of AmeriFactors and prove AmeriFactors' breach of contract claim against Dunham Price such that reasonable jurors could not arrive at a contrary verdict." Following a hearing on the JNOV motion, the trial judge denied the motion on November 3, 2022.

On November 21, 2022, AmeriFactors appealed "the Judgments signed on July 13, 2022 and November [3], 2022 and all adverse decisions and orders entered into by the trial court, including the rulings dated March 15, 2021 and May 3, 2022."[9] On appeal, AmeriFactors alleged the following three assignments of error (footnotes omitted):

1. The Trial Court erred when it entered judgment in favor of Dunham Price Group, LLC and DP Aggregates, LLC, and against AmeriFactors Financial Group, LLC, on all of AmeriFactors' claims in its Petition and dismissed these claims with prejudice.

   a. The jury's verdict was manifestly wrong and contradicted the overwhelming facts and evidence presented at trial.

   b. The Trial Court erred in instructing the jury that the validity of the contracts was for their determination without providing any further instructions regarding valid contracts.

2. The Trial Court erred when it entered the order denying AmeriFactors Financial Group, LLC's Motion for Judgment Notwithstanding the Verdict.

3. The Trial Court erred when it denied AmeriFactors Financial Group, LLC's Motions for Summary Judgment.

On December 29, 2022, Dunham Price filed an answer seeking to "appeal that portion of the judgment in which the Court dismissed its claims in its Petitions in Reconvention as well as all other adverse decisions rendered against it during the course of this litigation." In its appeal, Dunham Price alleges the following five assignments of error:

1. Whether the trial court committed legal error by refusing to charge the jury with Dunham Price's requested jury charges 5 and 6 regarding [La.R.S.] 10:9-403, thus entitling Dunham Price to a *de novo* review.

---

[9] Because we find there were genuine issues of fact that support the trial court's denial of AmeriFactors' motions for summary judgment, we will not address the March 15, 2021 and May 3, 2022 interlocutory judgments.

2.      Under a *de novo* review, the jury finding that AmeriFactors did not breach its contract was erroneous—the contract being that between Genesis and Dunham Price that was assigned to AmeriFactors.

3.      Alternatively, under a *de novo* review, Dunham Price proved the elements of detrimental reliance by a preponderance of the evidence and the jury finding to the contrary was erroneous.

4.      Alternatively, under a *de novo* review, Dunham Price proved the elements of unjust enrichment by a preponderance of the evidence and the jury finding to the contrary was erroneous.

5.      Under a *de novo* review, the jury erred in failing to award damages to Dunham Price of $1,186,164.77 as the amount paid to AmeriFactors when AmeriFactors failed to verify whether Genesis paid its subcontractors.

## LAW AND ANALYSIS

### *Jury Instructions*:

Both AmeriFactors and Dunham Price contend the trial judge committed legal error when he failed to adequately charge the jury. AmeriFactors argues the trial judge "erred in instructing the jury that the validity of the contracts was for their determination without providing any further instructions regarding valid contracts" while Dunham Price argues the trial judge "committed legal error by refusing to charge the jury with Dunham Price's requested jury charges 5 and 6 regarding [La.R.S. 10:9-403.]"

Louisiana Code of Civil Procedure Article 1792(B) requires the trial judge to "instruct the jurors on the law applicable to the cause submitted to them." In discussing jury instructions, the supreme court, in *Adams v. Rhodia, Inc.,* 07-2110, pp. 5–8 (La. 5/21/08), 983 So.2d 798, 804–05 (internal citations omitted) stated, in pertinent part:

> The trial court is responsible for reducing the possibility of confusing the jury and may exercise the right to decide what law is applicable and what law the trial court deems inappropriate.

18

Adequate jury instructions are those which fairly and reasonably point out the issues and which provide correct principles of the law for the jury to apply to those issues. The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party; the judge must, however, correctly charge the jury. If the trial court omits an applicable, essential legal principle, its instruction does not adequately set forth the issues to be decided by the jury and may constitute reversible error.

. . . .

Louisiana jurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. Trial courts are given broad discretion in formulating jury instructions and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law. The rule of law requiring an appellate court to exercise great restraint before upsetting a jury verdict is based, in part, on respect for the jury determination rendered by citizens chosen from the community who serve a valuable role in the judicial system. We assume a jury will not disregard its sworn duty and be improperly motivated. We assume a jury will render a decision based on the evidence and the totality of the instructions provided by the judge.

However, when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its deliberation. Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice.

Determining whether an erroneous jury instruction has been given requires a comparison of the degree of error with the jury instructions as a whole and the circumstances of the case. Because the adequacy of jury instruction must be determined in the light of jury instructions as a whole, when small portions of the instructions are isolated from the context and are erroneous, error is not necessarily prejudicial. Furthermore, the manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts. Thus, on appellate review of a jury trial the mere discovery of an error in the judge's instructions does not of itself justify the appellate court conducting the equivalent of a trial *de novo*, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case.

Therefore, we must exercise great restraint before overturning a jury verdict and must only reverse when "the jury instructions are so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and the facts." *Johnson v. First Nat. Bank of Shreveport*, 00-870, pp. 23–24 (La.App. 3 Cir. 6/20/01), 792 So.2d 33, 52, *writs denied*, 01-2770, 01-2783 (La. 1/4/02), 805 So.2d 212, 213.

AmeriFactors argues on appeal that "[t]he jury instructions did not adequately set forth essential legal principles necessary to determine the validity of the contracts." Specifically, AmeriFactors disagreed with the trial judge's response to the following question that the jurors had during deliberations, "Is AmeriFactors['] verification agreement a valid contract?" The trial judge responded with "for your [the jury's] determination." AmeriFactors objected to the response, asserting that this was not a question for the jury to decide as both parties admitted that the verification agreements were valid contracts. Dunham Price responded by arguing that it was for the jury to determine whether the verification agreements were valid contracts. The trial judge and counsel discussed this issue on the record, as follows:

THE COURT:

(As Read) Is Ameri[F]actors['] verification agreement a valid contract.

MR. BAGOT:

Can you just refer them to see question 1 on the jury verdict form?

MR. TILLERY:

No. You have to say you have to decide that based on the evidence and the law we have given you. You have to decide whether it's a valid -- that's the whole question.

That's a decision for them to make based on the facts and the law you have given to them, Judge.

MR. ST. MARTIN:

Your Honor, we stand by that Dunham Price has judicially admitted that valid contracts exist and so has Ameri[F]actors.

MR. TILLERY:

Of course, that's not -- you can't refer them to the testimony. Then I'm gonna start saying, well, they admitted they were in bad faith, they admitted they misrepresented themselves to us.

I mean, the question is, is it a verified, valid contract. That's for them to make based upon the facts and the law you have given them, Judge.

That's the way we've answered these questions over the years for sure.

You can't isolate some testimony and give it to them.

MR. BAGOT:

Judge, we've already –

THE COURT:

Was that stipulated to the jury?

MR. TILLERY:

What? That it's a valid contract?

THE COURT:

That it was a valid contract.

MR. TILLERY:

Absolutely not.

MR. BAGOT:

Yes, Your Honor.

MR. TILLERY:

It's a -- it's not a valid contract. It's a contract, it's definitely not a valid contract. That's my whole case.

21

MR. BAGOT:

Well, you approved the verdict form.

MR. TILLERY:

It didn't say it's a valid.

THE COURT:

Well, it says "contract", it doesn't say valid contract.

. . . .

THE COURT:

I'm going to put for your determination.

MR. TILLERY:

That's fine.

MR. ST. MARTIN:

Fine.

The jury also asked, during deliberations, the following question: "What do we use to determine what makes a valid contract, (legal definition)?" The trial judge provided them with the definition of a contract under La.Civ.Code art. 1906, by responding: "A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished."

Prior to the jury deliberations, the trial judge provided the following instructions on contracts to the jury (upper case font removed):

To prove a breach of contract claim, AmeriFactors must show by a preponderance of evidence that:

(1) a valid contract existed;

(2) a breach occurred; and

(3) damage was incurred as a result of the breach.

22

Under Louisiana law, a contract between two parties has the force of law as to them. You are called upon to interpret the contract between these two parties, and thus to determine the meaning and consequences of the law which they have written for themselves. You are to interpret the contract according to the following rules.

In interpreting this contract, you must determine what the common intent of the parties was. If the words of the contract are clear and do not lead to absurd results which the parties could not possibly have intended, you do not need to do any further interpretation to find their common intent.

The words in this contract must be given the meaning which they generally have in everyday use. If a word is a term of art or has a technical meaning within the context of this contract, you should give it that special meaning.

If a word may have several meanings, you should interpret it as having the meaning which is most in line with the objective of the contract.

Also, if a provision in the contract has different meanings and one of those meanings would make the provision effective and one would not, you should give it the meaning which would make it effective, since we assume the parties wanted their contract to be effective.

You should not interpret a contractual provision standing alone, but rather you should interpret it in light of the other contractual provisions so that each provision will be given the meaning which is suggested by the contract as a whole.

. . . .

You cannot relieve a party from its clear obligations due to a bad bargain, no matter how harsh. If a contract is clear and unambiguous, the obligations under the contract should not be disregarded under the pretext of pursuing the spirit of the contract.

Generally, under Louisiana law, an assignee (here, AmeriFactors) has no greater rights than an assignor (here Genesis Venture Logistics, LLC). It is for you to decide if Dunham-Price/DP Aggregates has actually waived their defenses.

Even if you decide that the waiver of defenses provision is valid, then you must still determine whether the other provisions of the assignment are enforceable.

Louisiana's laws governing commercial transactions state that "every contract or duty within this title imposes an obligation of good faith in its performance and enforcement". Good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing.

In the instant case, the jury verdict form required the jury to determine: (1) whether AmeriFactors proved that Dunham Price "breached its contracts [the verification agreements] with AmeriFactors[;]" (2) whether Dunham Price proved "that AmeriFactors breached its contract[;]" (3) whether Dunham Price proved "that they relied on AmeriFactors' representations to their detriment[;]" and (4) whether Dunham Price proved "that AmeriFactors was unjustly enriched." The trial court properly instructed the jury on the legal principles governing the formation of contracts and noted that the jury would have to make a factual determination as to whether the verification agreements, signed by Dunham Price, were valid and enforceable contracts and, if so, whether the terms were breached. After considering the trial judge's lengthy jury instructions and supplemental instructions as a whole, and the circumstances of this case, we find no prejudicial error in the trial judge's response of "for your determination" to the jury's question of whether the verification agreements are a valid contract. Accordingly, we find the jury instructions were adequate and did not mislead the jurors in any way from reaching a verdict based on the law and facts.

We also find no merit to Dunham Price's assignment of error that the trial court legally erred by refusing to charge the jury with its requested jury charges five and six regarding La.R.S. 10:9-403(b).[10] Dunham Price did not submit a jury

---

[10] Dunham Price's requested special jury instruction number five provides:

Louisiana Revised Statute[s] 10:9-403(b) is the statute that governs the dispute in this case about agreements waiving defenses. It is entitled, "Agreement not to assert claim or defense" and it states:

instruction containing the entirety of La.R.S. 10:9-403 but rather only addressed section (b), which involves "an agreement between an account debtor and an assignor not to assert against an assignee any claim or defense that the account debtor may have against the assignor[.]" However, La.R.S. 10:9-403(f), provides that "this Section does not displace law other than this Chapter which gives effect to an agreement by an account debtor not to assert a claim or defense against an assignee." In denying Dunham Price's request for a directed verdict based on La.R.S. 10:9-403(b), the trial judge stated:

> [It] is conceded and no one is arguing, that in the very brief, nominal contract that is between Genesis and Dunham Price is there any

---

> Except as otherwise provided in this Section, an agreement between an account debtor and an assignor not to assert against an assignee any claim or defense that the account debtor may have against the assignor is enforceable by an assignee that takes an assignment:
>
> (1) for value;
>
> (2) in good faith;
>
> (3) without notice of a claim of a property or possessory right to the property assigned; and
>
> (4) without notice of a defense or claim in compensation, set-off, or recoupment of the type that may be asserted against a person entitled to enforce a negotiable instrument under R.S. 10:3-305(a).[]
>
> In this case, the "account debtor" is Dunham-Price/DP Aggregates, the "assignor" is Genesis, and the "assignee" is AmeriFactors.

Dunham Price's requested special jury instruction number six provides (alterations in original):

> To obtain a valid waiver of defenses, AmeriFactors must prove that it complied with § 10:9-403(b). "[U]nder Louisiana Revised Statute[s] § 10:9-403(b), only agreements between an account debtor [(here Dunham-Price and DP Aggregates)] and an assignor [(here Genesis)] are contemplated, not an agreement between an account debtor [(here Dunham-Price and DP Aggregates)] and an assignee [(here AmeriFactors)]." If there is no waiver in the contract between Dunham Price/DP Aggregates and Genesis, there can be no waiver in the assignment that AmeriFactors took from Genesis against Dunham-Price and DP Aggregates.

suggestion or discussion of either the assignation of any debts or the waiver of defenses. I acknowledge that, and no one is disputing that.

But it has been made abundantly clear that Ameri[F]actors did not buy the contract from Genesis, they bought the invoices from Genesis. They paid for those invoices.

The waiver of defenses that is claimed by Ameri[F]actors was pursuant to the agreement between Ameri[F]actors and Dunham Price. Dunham Price could have refused to sign that contract. They could have cited and said, no, we never agreed to waive defenses. They had no pressure on them other than their own created pressure to sign that document. I just refuse to believe that there are statutes either in Louisiana law, in the UCC, that preclude prudent business people from making their own decisions.

Could it be forced on them, Dunham Price? No. Can they make their own decision to do it? Yes, and they did.

"[U]nder Louisiana Revised Statute[s] § 10:9-403, only agreements between an account debtor and an assignor are contemplated, not an agreement between an account debtor and an assignee." *Factor King, LLC v. Block Builders, LLC*, 192 F.Supp. 3d 690, 694 (M.D. La. 2016). *See also*, L. David Cromwell, "Agreement not to assert claims or defenses—Agreements between account debtor and assignee," La. Prac. Secured Transactions § 9:31 (2023–2024 ed.) (emphasis in original), which provides:

The rule expressed in La. R.S. 10:9-403(b) applies only to agreements between an account debtor and an *assignor*; the rule does not apply to agreements that are made directly between the account debtor and the *assignee*. The enforceability of those agreements is governed by law outside Louisiana UCC Chapter 9. See La.R.S. 10:9-403, Uniform Commercial Code Comment 6.

Accordingly, we find La.R.S. 10:9-403(b) inapplicable in this situation, wherein the waiver of defenses is made in an agreement between the account debtor (Dunham Price) and the assignee (AmeriFactors), and that the trial court properly refused Dunham Price's requested special jury instructions numbered five and six.

Because we find no legal error in the jury instructions that warrant a de novo review, we will now review the jury's verdict and the denial of the JNOV under a manifest error standard of review.

### *Standard of Review:*

"A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of 'manifest error' or unless it is 'clearly wrong.'" *Stobart v. State through Dep't of Transp. & Dev.*, 617 So.2d 880, 882 (La.1993). Under a manifest error standard of review, this court can only reverse if it finds, based on the entire record, that there is no reasonable factual basis for the factual finding and that the factfinder is clearly wrong. *Id.* As stated in *Rosell v. ESCO*, 549 So.2d 840, 844–45 (La.1989) (citations omitted):

> When findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

Thus, this court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. "The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses . . . but also upon the proper allocation of trial and appellate functions between the respective courts." *Canter v. Koehring Co.*, 283 So.2d 716, 724 (La.1973).

27

Additionally, this court can only reverse a trial court's decision to deny a JNOV "if it is manifestly erroneous."[11] *Peterson v. Gibraltar Sav. & Loan*, 98-1601, p. 6 (La. 5/18/99), 733 So.2d 1198, 1203. The supreme court provided the following criteria applicable to our review of the denial of AmeriFactors' motion for JNOV:

> JNOV is warranted only when the facts and inferences, viewed in the light most favorable to the party opposing the motion, is so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict; the motion should be granted only when evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover.

*Id.* (internal citations omitted). "This rigorous standard is based upon the principle that '[w]hen there is a jury, the jury is the trier of fact.'" *Joseph v. Broussard Rice Mill, Inc.*, 00-0628, p. 5 (La. 10/30/00), 772 So.2d 94, 99 (quoting *Scott v. Hospital Serv. Dist. No. 1*, 496 So.2d 270, 273 (La.1986)).

### *The Jury Verdict and the Denial of JNOV:*

AmeriFactors argues "[t]he jury had no reasonable factual basis in finding that Dunham Price did not breach the verification agreements." AmeriFactors cites to the trial testimony and exhibits to argue that it "established that the verification agreements were valid contracts[,]" and that "Dunham Price, by its own admission, breached the verification agreements while AmeriFactors performed fully."

"[G]enerally, legal agreements have the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom." *Blackwell v. Waste Mgmt. of Louisiana, LLC*, 14-560, p. 9 (La.App. 3 Cir. 11/5/14), 150 So.3d 664, 670. However, "[u]nder Louisiana law,

---

[11] Louisiana Code of Civil Procedure Article 1811 provides for the use of a motion for a JNOV, which allows a trial court to correct a legally erroneous verdict. *See White v. Williams*, 563 So.2d 1316 (La.App. 3 Cir.), *writ denied*, 568 So.2d 1056 (La.1990).

28

when there is any doubt about the meaning of an agreement, the court must ascertain the common intention of the parties, rather than adhering to the literal sense of the terms." *Redstone v. Sipes*, 53,416, p. 6 (La.App. 2 Cir. 4/22/20), 294 So.3d 1113, 1118; La.Civ.Code art. 1950. "A contract is incomplete unless there be a meeting of the minds of the parties upon the common ground of a mutual understanding of facts and of subject-matter." *Jones v. Janes,* 156 La. 715, 101 So. 116, 117 (1924).

In the instant case, as previously stated, the jury was instructed that in order "[t]o prove a breach of contract claim, AmeriFactors must show by a preponderance of evidence that: (1) a valid contract existed; (2) a breach occurred; and (3) damage was incurred as a result of the breach." The jury was instructed "to interpret the contract between these two parties, and thus to determine the meaning and consequences of the law which they have written for themselves." The jury was further instructed that "[i]n interpreting this contract, you must determine what the common intent of the parties was" and that "[i]f the words of the contract . . . do not lead to absurd results which the parties could not possibly have intended, you do not need to do any further interpretation to find their common intent."

At trial, the jury heard the following testimony of Robert Price, III, in regard to the verification forms and Dunham Price's obligations to AmeriFactors (emphasis added):

> Q.    [Reading from prior deposition] (As Read)  You knew that you were taking the risk at that point, that they would perform their contract. Your answer was, (As Read) Correct.  Is that correct?
>
> A.    That's what it says.
>
> Q    Okay. So you were gonna be obligated to AmeriFactors no matter what.  Correct?
>
> A.    No, I don't think so.

Q. Why do you disagree?

A. **Because theft is a different issue. This—if it was shoddy business, or—I don't know—a boat sank or there were other things going on, that's one thing, but when she's being given the money based on my signature to use to pay the subcontractors and it disappears, I don't think that's an absolute.**

Q. Well—

A. If I'm involved in a criminal conspiracy or getting involved with something of that nature, I don't think that's an absolute. I don't think that's right.

Q. But you understand that you're not dealing with somebody who is stealing money or taking money, that was apparently Ms. Lorraine Hyde of Genesis, you were dealing with AmeriFactors. Correct?

A. I don't agree with that entirely, no.

Q. Your contract under the verification—

A. AmeriFactors was aware of Ms. Lorraine Hyde.

Dunham Price introduced evidence showing that, if Genesis failed to pay its subcontractors, it would legally have to step in and make those payments. Dunham Price produced evidence showing that it paid AmeriFactors $1,186,164.77 for the first six invoices on the understanding that its money was going towards the work being done on the project. However, Dunham Price testified that once it learned that the money paid to AmeriFactors was not going to the subcontractors, it had no choice but to halt payment to AmeriFactors and to pay $1,326,714.56 directly to the subcontractors.

It is unclear which element(s) of the breach of contract claim the jury had issues with; however, even assuming that AmeriFactors proved the verification agreements were valid contracts, we find there was a reasonable basis in the record for the jury to conclude that Dunham Price did not breach the verification agreements considering the fact that it would be an absurd result if the words of the verification

forms meant that the money Dunham Price paid to AmeriFactors would not go toward paying the subcontractors, who were doing all of the work. Again, the jury heard testimony for three days regarding the nature of the verification agreements and the fact that Dunham Price had no choice but to halt its payments to AmeriFactors in order to pay the subcontractors directly. As such, we find the trial court did not err when it entered its judgment on the jury's verdict and when it denied AmeriFactors' motion for JNOV. "[W]here two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Stobart*, 617 So.2d at 883.

Dunham Price also argues on appeal that the jury erred in finding that AmeriFactors did not breach its contract, the contract being that between Genesis and Dunham Price that was assigned to AmeriFactors. Dunham Price argues that "[i]f the assignment taken by AmeriFactors was of the contract between Genesis and Dunham Price, then AmeriFactors stepped into the shoes of Genesis." However, we find no merit to this assignment of error as there is no evidence in the record reflecting that AmeriFactors was obligated to perform Genesis' work through an assignment of the Barge Transportation Agreement between Dunham Price and Genesis. As stated previously, in denying Dunham Price's directed verdict, the trial judge stated that "it has been made abundantly clear that Ameri[F]actors did not buy the contract from Genesis, they bought the invoices from Genesis. They paid for those invoices."

Alternatively, Dunham Price argues on appeal that it proved the equitable principles of detrimental reliance and/or unjust enrichment by a preponderance of the evidence and that the jury erred in finding to the contrary. For the reasons that follow, we find no merit to these arguments.

The doctrine of detrimental reliance is found in La.Civ.Code art. 1967, which provides:

> Cause is the reason why a party obligates himself.
>
> A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

Detrimental reliance "is designed to prevent injustice by barring a party, under special circumstances, from taking a position contrary to his prior acts, admissions, representations, or silence." *Am. Bank & Trust Co. v. Trinity Universal Ins. Co.,* 251 La. 445, 459, 205 So.2d 35, 40 (1967). In order to successfully assert a claim for detrimental reliance, a plaintiff must establish: "(1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance." *Luther v. IOM Co. LLC,* 13-353, pp. 10–11 (La. 10/15/13), 130 So.3d 817, 825. Detrimental reliance is not favored in Louisiana and thus, "a party cannot avail himself of that doctrine if he fails to prove all essential elements of the plea." *Id.*

The doctrine of unjust enrichment is provided for in La.Civ.Code art. 2298 and states, in pertinent part:

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.

Recovery pursuant to unjust enrichment requires a plaintiff to prove: "(1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and

32

the resulting impoverishment; (4) an absence of justification or cause for the enrichment and impoverishment; and (5) the lack of another remedy at law." *Davis v. Elmer,* 14-1298, p. 7 (La.App. 1 Cir. 3/12/15), 166 So.3d 1082, 1088.

Again, it is unclear from the jury verdict whether or not the jury found the verification agreements between AmeriFactors and Dunham Price were valid contracts; however, it is clear that the jury found that Dunham Price failed to prove "that [it] relied on AmeriFactors' representations to [its] detriment[,]" and "that AmeriFactors was unjustly enriched[.]" We cannot say that the jury manifestly erred in these rulings, especially considering the testimony of Ryan Price and Robert Price, III, wherein they admit that AmeriFactors did not provide any false or misleading information to Dunham Price and that AmeriFactors fulfilled its obligations to Dunham Price pursuant to the verification agreements. Further, we agree with AmeriFactors that there is no evidence in the record to support Dunham Price's argument for unjust enrichment because AmeriFactors was impoverished by the actions of both Dunham Price and Genesis.

For these reasons, we hereby affirm the July 13, 2022 trial court judgment in its entirety as well as the November 3, 2022 judgment denying the motion for JNOV. Costs of this appeal are split between the parties.

**AFFIRMED.**